MANUFACTURERS HANOVER TRUST COMPANY, as Trustee Under Indenture Dated November 15, 1927, Made by Henry H. Rogers, Deceased

v.

The UNITED STATES.

No. 311-61.

United States Court of Claims.

Feb. 6, 1963.

Hewitt A. Conway, New York City, for plaintiff. Kelley, Drye, Newhall, Maginnes & Warren, New York City, were on the brief.

David D. Rosenstein, Chicago, Ill., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the briefs.

DAVIS, Judge.

This is a suit brought by plaintiff, as trustee under a trust indenture executed by Henry H. Rogers on November 5, 1927, to obtain a refund of income taxes and interest in the amount of $23,008.89, which was paid by the trust for calendar year 1954. The case is before the court on plaintiff's motion and defendant's cross-motion for summary judgment, and presents three issues which call for resolution: (1) whether attorneys' fees incurred by the taxpayer in certain trust litigation are deductible as ordinary and necessary expenses for the management, conservation, or maintenance of property held for the production of income, or whether the expenses were capital expenditures incurred in defending or perfecting title to property; (2) whether capital gains and other gross income allocated to trust principal are to be taken into account in determining the amount of expenses, otherwise deductible by the trust, which are rendered nondeductible because allocable to tax-exempt income; and (3) whether taxpayer, in its claim for refund, made a sufficient demand for a deduction for the amount of income which it was required to distribute currently to the beneficiaries.

Plaintiff is a corporation organized under New York law for the conduct of a banking and trust business. On November 5, 1927, Henry H. Rogers executed an indenture transferring property in trust to an individual trustee, since deceased, and to plaintiff's predecessor, in contemplation of his daughter Millicent's forthcoming marriage to Arturo Peralta Ramos. The marriage took place two days later. Under the terms of the indenture, the net income of the trust was payable to Millicent for life, and at her death the trust was to be divided into equal shares (after making provision for her husband, if he survived her and had the marriage not terminated in divorce—as it did), one share to be held in trust for and the net income paid for life to each surviving child of the marriage.[1] Thereafter, the corpus was to be paid to that child's issue *per stirpes;* or, in default of issue, to his brothers or sisters or their issue; and in case of default of such beneficiaries, to the grantor or those entitled to take under his will. The indenture also contained reservations of reversionary interests in the event that Millicent might be survived by only one child, or by no children, but these provisions never came into effect, for at her death on January 1, 1953, she was survived by two sons of her marriage to Ramos—Arturo Henry Peralta Ramos and Paul Jaime Peralta Ramos, who were born on November 14, 1928, and February 18, 1931, respectively. The grantor, Henry H. Rogers, died testate on July 25, 1935, leaving a part of his residuary estate in

---

1. Had there been surviving issue of deceased children of the marriage, one share was to be similarly set aside for the issue of each deceased child.

trust for his widow, Pauline. She survived him, and by remarriage became Pauline V. Hoving.

After the death of Millicent, early in 1953, there was uncertainty as to the validity of the continuing trusts to Arturo Henry and Paul under Section 11 of the New York Personal Property Law, McKinney's Consol. Laws, c. 41, which prohibits suspension of the absolute power of alienation for more than two lives in being. On January 7, 1954, the plaintiff filed a petition in the Supreme Court of the State of New York for an order settling its account as trustee and fixing and allowing its commissions, and also construing the trust indenture and the grantor's will and instructing plaintiff as to the disposition of the trust assets. Millicent's executors, her two sons born of the marriage with Ramos, the infant son of Arturo Henry Ramos, another son of Millicent by a later marriage, and Mrs. Hoving were among those made parties to the proceeding, and they, as well as plaintiff, participated and prepared briefs on the issue of the validity of the trust. The position of Mrs. Hoving, residuary legatee of Henry Rogers, was that under New York law the continuing trusts for Arturo Henry and Paul were illegal and void, and she may also have attacked the entire inter vivos trust indenture of November 5, 1927. The other participants, opposing the interpretation advanced by Mrs. Hoving, contended that the trust indenture was wholly valid.

On November 29, 1954, before the cause was decided by the state court, the parties settled the proceeding by stipulation, after extended negotiations. Under the terms of this agreement, Mrs. Hoving withdrew her answer, consented that an order be entered construing the secondary trusts as valid, and assigned any rights of hers to the assets of these trusts to Arturo Henry and Paul in return for their paying her from their own funds the sum of $40,000. The parties also stipulated, subject to court approval, the various allowances to be paid to the different attorneys (and to the guardian ad litem of the infant respondent), and that all such allowances should be paid by the trust. The court entered a final order on December 6, 1954, in conformity with the stipulations, that plaintiff's accounts as trustee were approved and settled; that the trusts to commence upon the death of Millicent for the benefit of Arturo Henry and Paul were valid and enforceable; and that the trustee was to pay out of the trust corpus $49,000 in attorneys' fees and $15.25 as disbursements.

When it filed its fiduciary income tax return for 1954, plaintiff claimed a deduction of the entire $49,015.25 paid out in the trust litigation. Upon audit, the Commissioner of Internal Revenue disallowed the deduction "to the extent of $35,315.25 for the reason that to that extent the expenditures were not deductible under section 212 of the Internal Revenue Code of 1954 but should be capitalized under section 263 as an expenditure to perfect title." The $13,700 allowed by the Commissioner was attributed by him to the accounting aspect of the litigation and therefore allowable as an ordinary and necessary expense of the trust. Plaintiff paid the deficiency and then filed a refund claim asserting that the entire amount of attorneys' fees was deductible (except to the extent, if any, allocable to tax-exempt income) as an ordinary and necessary expense. Rejection of the refund claim brings the matter before us.

There is no dispute as to the allocation of these litigation fees between the accounting and the trust-construction phases. Plaintiff's position is the broader one that the sums attributable to the construction aspect of the suit must also be allowed as a deduction under Section 212 of the Internal Revenue Code of 1954 (26 U.S.C. § 212 (1958 ed.)), authorizing the deduction of "all the ordinary and necessary expenses paid or incurred during the taxable year * * * for the production or collection of income * * * [or] for the management, conservation, or maintenance of property held for the production of income

\* \* \*[2], and more particularly by Treasury Regulation § 1.212–1(i), which says that "reasonable amounts paid or incurred by the fiduciary of an estate or trust on account of administration expenses, *including fiduciaries' fees and expenses of litigation,* which are ordinary and necessary in connection with the performance of the duties of administration are deductible under section 212 \* \*" (emphasis added). On the other hand, defendant relies, of course, on Treasury Regulation § 1.212–1(k):

> "Expenses paid or incurred *in defending or perfecting title to property,* in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in gross income), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses. Attorneys' fees paid in a suit to quiet title to lands are not deductible \* \* \*" (emphasis added).[3]

As we have recently noted with respect to comparable provisions under the 1939 Code, these sections of the statute and the regulations, taken together, require that, before the expenditures can be deductible, they must be (a) "ordinary and necessary"; (b) "paid or incurred during the taxable year"; (c) "for the production or collection of income," or "for the management, conservation, or maintenance of property held for the production of income"; and (d) other than capital expenditures, including expenditures incurred in "defending or perfecting title to property."

See California and Hawaiian Sugar Refining Corp. v. United States, Ct.Cl., 311 F.2d 235, 241, 242, decided December 5, 1962; Industrial Aggregate Co. v. United States, 284 F.2d 639, 644 (C.A.8, 1960). In this case the critical question is whether the expenditures were incurred in the defense or perfection of title.[4]

The binding effect of the rule that expenditures incurred in defending or perfecting title must be capitalized has long been recognized, and often applied. See, for example, Bowers v. Lumpkin, 140 F.2d 927, 151 A.L.R. 1336 (C.A.4, 1944); Roberts v. United States, 87 F.Supp. 935, 115 Ct.Cl. 428 (1950); Vernor v. United States, 23 F.Supp. 532, 87 Ct.Cl. 435 (1938); United States v. St. Joe Paper Co., 284 F.2d 430 (C.A.5, 1960); Brown v. Commissioner, 215 F.2d 697 (C.A.5, 1954); Safety Tube Corp. v. Commissioner, 168 F.2d 787 (C.A.6, 1948); Johnson v. Commissioner, 162 F.2d 844 (C.A.5, 1947); Jones' Estate v. Commissioner, 127 F.2d 231 (C.A.5, 1942); Boulder Building Corp. v. United States, 125 F.Supp. 512 (W.D.Okla. 1954); Coughlin v. Commissioner, 3 T.C. 420 (1944). The validity of the rule is settled, but problems continue to arise in its application to the varieties of particular circumstance. See, e. g., the various opinions in Ruoff v. Commissioner, 277 F.2d 222 (C.A.3, 1960), and 30 T.C. 204 (1958). When is an expenditure merely conservative, and when does it exceed this line and become an element of title perfection or defense? The subsidiary principles are not fully developed; the answer often depends, also, on a weighing of the individual facts.

2. Section 641 (1954 I.R.C.) provides that the taxes imposed by the Code upon individuals shall apply to the taxable income of any kind of property held in trust.

3. This regulation comports with Sections 261 and 263 of the Code, which together declare that "[i]n computing taxable income no deduction shall in any case be allowed" for capital expenditures, defined to include "[a]ny amount paid out \* \* \* for permanent improvements or betterments made to increase the value of any

property or estate." Treas.Reg. § 1.263 (a)–2(c) defines "the cost of defending or perfecting title to property" as a capital expenditure.

4. The assets of the trust consisted almost entirely of various types of securities (see footnote 8, infra) as to which Treas. Reg. § 1.212–1(k) can undoubtedly be invoked (if it is otherwise applicable). Cf. California and Hawaiian Sugar Refining Corp. v. United States, Ct.Cl., 311 F.2d 235, 242, 244, decided December 5, 1962.

There is as yet "no hard and fast rule" by which deductibility can "easily be determined" (Brown v. Commissioner, supra, 215 F.2d 697, 699 (C.A.5, 1954)); but certain helpful guidelines have been fixed, even though there may still be dispute as to others.

■ In ascertaining the character of an expenditure for legal fees, the courts uniformly look first to the primary purpose of the litigation. "[I]f the primary purpose * * * was title, then the expenditure is capital in nature and must be capitalized; if the aspect of title is only incidental to the primary purpose of the litigation, then the expense is deductible as such and need not be capitalized." Loyd v. United States, 153 F.Supp. 416, 419, 139 Ct.Cl. 626, 632 (1957); Industrial Aggregate Co. v. United States, supra, 284 F.2d at 645; Ruoff v. Commissioner, supra, 277 F.2d 222 (C.A.3, 1960). It makes no difference that the expenditures were ordinary and necessary in the colloquial sense, or that they affected the possibility of obtaining income, or even that they arose from following the only feasible course open to the taxpayer. If the primary purpose of the proceeding was defense or perfection of title to property, the expenses must be capitalized. Especially in this area is it true that "[n]ot every expenditure can be claimed as a deduction, and this is so whatever may be the effect of the expenditure upon the profit-seeking activities of the taxpayer." Lewis v. Commissioner, 253 F.2d 821, 825 (C.A.2, 1958). Moreover, contrary to plaintiff's assertion, section 1.212–1(i) of the Treasury Regulations, quoted above, does not "flatly allow" all fiduciaries' expenses of litigation as deductions. Such expenses are allowed only so long as they do not fall within the proscription of subsection (k) of the same regulation (and Section 263 of the Code and its regulations), pertaining to non-deductible capital expenditures. We find nothing in the 1954 Code or regulations indicating that fiduciaries, when faced with the necessity of making capital expenditures, should be afforded treatment so radically different from that accorded other taxpayers. Neither Congress nor the Treasury has purported to authorize a fiduciary to consider *all* of its litigation expenditures as "ordinary and necessary expenses."

Attempting to show that, in any case, the trust-construction proceeding did not have as its primary goal the defense of the trust's title to its assets, the plaintiff asserts that under New York law it had acquired an unimpeachably valid title to the entire trust property upon creation of the trust in 1927, and that the litigation was simply to determine the proper disposition in 1954 of the property committed to its care, i. e., whether after the death of Millicent Rogers in 1953 the trust assets should be used for the secondary trusts created for Arturo Henry and Paul Ramos or should be paid to the residuary legatees of Henry Rogers. Plaintiff says that under New York law the trust was indisputably lawful throughout the life of Millicent, and the only question which could possibly arise would be the continuing validity of the trusts for her sons after her death in 1953. The Government counters that the litigation was primarily to determine the initial validity of the trust's title to the property beginning with 1927; the brief points to certain principles of New York law holding that, if a grant violates the New York rules against perpetuities and the suspension of the power of alienation, it may be void from its inception and title, by operation of law, will remain in the grantor despite the trust agreement. Mrs. Hoving's challenge to the trust's title, the Government says, was of this fundamental character, raising the issue of whether the trustee ever had any valid title to the trust assets.

■ It is unnecessary, we think, to determine whether the question of New York law involved in the state litigation was the trust's right to the property *ab initio*, or solely the trust's continued legal title after the death of Millicent. A decision adverse to the plaintiff, rendered on either of these theories, would have deprived it of the title to the property,

which it would certainly have claimed and retained if it were not for this or comparable litigation. There was much more to the case than a mere request by plaintiff for directions as to the future distribution of trust assets which the trustee admittedly owned. The plaintiff was, at the least, seeking to perfect (and to defend) its very title to the property from and after January 1, 1953, when Millicent died; the minimal issue in the proceeding was a possible defect which would have voided the trustee's title on that date and would have required the property to revert back to the grantor's residuary estate. There was a direct challenge to the trustee's continued title, not simply a dispute between beneficiaries of the trust. Moreover, this defect, if it existed under New York law, was already inherent in the title when the trustee acquired the assets under the trust indenture in 1927; it was a substantial pre-existing flaw in the basic indenture, not a subsequent cloud upon a once perfect and unquestioned title.[5] Thus, it seems to us plain that, even on plaintiff's understanding of the precise issue in the construction proceeding, the perfection and defense of the trustee's claimed title to the trust property under the trust indenture was the essence of that suit. The litigation costs are therefore capital expenditures, rather than expenses deductible as ordinary and necessary under section 212. See Parkway Realty Corp. v. Commissioner, T.C.Mem. Dec., March 16, 1959; Brown v. Commissioner, 215 F.2d 697, 699–701 (C.A.5, 1954); Lewis v. Commissioner, 253 F.2d 821, 827–28 (C.A.2, 1958); Wilson v. Commissioner, 37 T.C. 230–234 (1961).[6]

This situation is to be distinguished from that which would arise if a fiduciary sought to deduct expenses incurred in determining which of several potential beneficiaries was entitled to receive trust property. There the fiduciary's title would not be at issue, and it would not be engaged in perfecting or defending title. In Trust of Bingham v. Commissioner, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670 (1945), expenses were incurred in winding up the trust after its expiration; the Court held that the *costs of distribution,* if ordinary and necessary, were deductible expenses incurred in the management of the trust property. Trust of Spero v. Commissioner, 30 T.C. 845, 855–856 (1958), is also a case in which the court felt itself to be dealing with expenses incurred in deciding which beneficiaries were the proper recipients of assets to be distributed by a fiduciary, as opposed to determining whether the trust had itself lost title to the property. Here the facts are the reverse.

Plaintiff argues that, nevertheless, we are compelled by our decision in Loyd v. United States, 153 F.Supp. 416, 139 Ct.Cl. 626 (1957), to rule in its favor. That case involved the deductibility of legal fees by the executors of a daughter's estate, which were paid to counsel for litigating the validity of a charitable bequest by her mother, the amounts of which would be included in the estate of the daughter, as sole heir of the grantor, if the mother's charitable grant was invalid under state law. As a result of this litigation holding the charitable bequest partly invalid, most of the property was delivered to the executors of

---

5. Under the view of Judge Forrester, dissenting in Ruoff v. Commissioner, 30 T.C. 204, 226–227 (1958), the proscription of the deduction of litigation expenses involved in perfecting or defending title applies only to situations where, at the time of the taxpayer's original acquisition, the title was, or was alleged to be, clouded.

6. In Allen v. Selig, 200 F.2d 487 (C.A.5, 1952) the court found that the purpose of the litigation in which the expenses were incurred was not to perfect or defend title but mainly to declare title to property already indisputably owned. See also Brown v. Commissioner, supra. In Ruoff v. Commissioner, 277 F.2d 222 (C.A.3, 1960), the court likewise held that the primary purpose of the suit was to recover possession of property already owned by the taxpayer. See also footnote 5, supra.

the daughter. While recognizing the validity of the rule requiring capitalization of the expenses of title, the court interpreted the record as indicating that "[t]he primary purpose, or at least the motivating force, of the litigation was not the question of who had title to the property, rather it was that the proper distribution of the estate's assets could not have been had without a prior determination by the court of the validity of the gift." Loyd v. United States, supra, 153 F.Supp. at 421, 139 Ct.Cl. at 634. Although title to certain property was one aspect of the litigation, it was incidental to the primary purpose of settling the two estates. The daughter's executors had a disputed claim to the assets marked for the charitable gift, but the overriding concern of the litigation, the court held (153 F.Supp. at 420, 139 Ct.Cl. at 633–634), was not the issue of title but the proper administration of the daughter's estate which could not have been had without "first obtaining the answer to the question of validity of the grant to the church." In the present case, unlike Loyd, there is no showing, and on this record no reason to believe, that the proceeding by plaintiff in the New York Supreme Court was instituted because it was absolutely essential to the further management of the trust. There was no impending marshalling and distribution of the assets held by plaintiff; the trust could well have gone on, as provided by the indenture, until challenged by a proper adverse party. In this light, the litigation voluntarily begun after Millicent's death had for its direct, if not sole, purpose a legal declaration, helpful but not mandatory, whether the indenture was effective to give the

trust continued title to the property. The costs of this type of quiet-title proceeding are capital expenditures rather than deductible expenses of trust administration.[7]

█ The second issue relates to the allocation of the legal fees and trustee's commissions paid or incurred by the taxpayer, and otherwise allowable as "ordinary and necessary" deductions under Section 212, between taxable income and tax-exempt income (here, tax-exempt interest) received by the trust in 1954. Section 265 provides that no deduction shall be allowed for any amount allocable to a class of income wholly exempt from income tax. Treasury Regulation § 1.265–1(c), promulgated under this section of the Code, sets forth, in general terms, the method by which this allocation is to be made:

"(c) *Allocation of expenses to a class or classes of exempt income.* Expenses and amounts otherwise allowable which are directly allocable to any class or classes of exempt income shall be allocated thereto; and expenses and amounts directly allocable to any class or classes of nonexempt income shall be allocated thereto. If an expense or amount otherwise allowable is indirectly allocable to both a class of nonexempt income and a class of exempt income, a reasonable proportion thereof determined in the light of all the facts and circumstances in each case shall be allocated to each."

Plaintiff reported the receipt of $8,-370.85 during 1954 as interest wholly exempt from federal income taxes.[8] The defendant allocated the indirect expenses

7. The Tax Court has recently disallowed, as a deduction under Section 212, the $20,000 payment made by Arturo Henry Peralta Ramos to Mrs. Hoving, and has held it to be a capital expenditure. Ramos v. Commissioner, 38 T.C. No. 81, decided September 11, 1962.

8. On its tax return plaintiff reported receipt of the following types and amounts of income during the year: domestic dividends allocable to income—$26,245.95;

foreign dividends allocable to income—$150.00; interest allocable to income—$468.75; taxable stock dividends allocable to principal—$162.25; long-term capital gain allocable to principal—$71,205.24; short-term capital loss allocable against principal—$171.10; and tax-exempt interest—$8,370.85. In addition to the legal fees of $49,015.25 discussed above, plaintiff and defendant do not dispute that the following amounts were paid or incurred during the year: for trustee's

(legal fees and commissions) between tax-exempt interest, on the one hand, and dividends and taxable interest, on the other, but, in so doing, excluded from the allocation base capital gains and taxable stock dividends, both of which, although elements of the trust's taxable income, were allocable to the principal of the trust under local law and the trust indenture. By the exclusion of these elements of taxable income from the base, the portion of the indirect expenses allocable to tax-exempt interest, and hence not deductible, was significantly increased. It is this refusal of the Internal Revenue Service to consider all the elements of the trust's taxable income, in making the allocation, which prompts plaintiff's complaint.

Since trust income is involved, it will help to begin with a brief outline of the special taxing system established by subchapter J of chapter 1 of the 1954 Code, the portion dealing with the income taxation of estates, trusts, beneficiaries, and decedents. "The basic principle underlying the taxation of * * * ordinary trusts is that all the taxable income is to be taxed as income only once—either to the * * * trust, or to the beneficiary, or in part to each. This is accomplished by allowing the estate or trust a deduction for certain amounts distributed or required to be distributed [whether or not actually distributed], and taxing the beneficiary on such amounts." Montgomery's Federal Taxes, 20.1 (38th ed. 1961). In general, this scheme of

taxation is implemented by treating a trust as a separate taxable entity, the taxable income of which is computed in the same manner, and taxed to the same extent, as the taxable income of an individual—with certain exceptions set forth in the Code.[9] §§ 641, 642, 651, 1954 I.R.C. Chief among these exceptions is the authorization of a deduction for that "income"[10] of the taxable year which is required to be distributed currently. § 651(a), 1954 I.R.C. This deduction is designed to avoid the double taxation that would result if the income required to be distributed were first taxed to the trust, and then taxed again when distributed to the beneficiaries. So that the income not go untaxed, the Code requires that the beneficiaries include in their gross incomes the trust income distributable to them, whether it is actually distributed or not. § 652(a), 1954 I.R.C.

The central device utilized to effectuate this "flow-through" scheme of taxation is "distributable net income"—a crucial term in the present case. This is defined by Section 643(a) as the taxable income of the trust with certain important modifications, the most pertinent of which are:

1. Distributions to beneficiaries are *not deducted*.

2. Capital gains allocable to corpus (as here), and not paid, credited, or required to be distributed to any beneficiary, or paid or permanently

---

commissions—$3,350.68; and for N.Y. Corpus Profits Tax—$1,058.88. Defendant allowed deduction of the latter amount in its entirety without requiring allocation to tax-exempt income.

9. The Code contains separate provisions dealing with those trusts which are required to distribute income currently, do not provide that amounts are to be paid or set aside for charitable purposes, and do not distribute amounts other than current income during the taxable year, from the provisions relating to "trusts accumulating income or distributing corpus." Although the basic principle underlying the taxation of both types of trust is the same (see subparts B and C,

part I, subchapter J, chapter 1, Internal Revenue Code of 1954), our discussion will not refer to subpart C, governing "trusts accumulating income or distributing corpus."

10. "Income" in this sense is defined in Section 643(b) as "the amount of income of the * * * trust for the taxable year determined under the terms of the governing instrument and applicable local law." Thus, capital gains allocable to principal are not considered as "income" for this purpose, although they are an element of taxable income, while tax-exempt interest is normally included in "income" for this purpose.

·set aside for charitable purposes, are ·excluded.

3. For trusts like plaintiff's ·which distribute current income ·only, extraordinary dividends or tax.able stock dividends not paid or credited to any beneficiary because allo·cated by the fiduciary (in good faith) to principal, are *excluded*.

4. Tax-exempt interest, "reduced by any amounts which would be deductible in respect of disbursements allocable to such interest but for the provisions of section 265 (relating to disallowance of certain deductions)," is *included*.

.Around this concept of "distributable net ·income" the Code builds its provisions ·for (a) the deduction allowed the trust ·for its current distributions to the ben·eficiaries, and (b) the distributions ·which the beneficiaries must include in their own gross incomes.[11] "Thus, dis·tributable net income has been termed ·the measuring rod or yardstick to be ·employed in determining, on the one hand, the maximum deduction for distributions which may be allowed to the ·estate or trust and for gauging, on the ·other hand, the extent to which benefici.aries may be taxable on the distributions." 6 Mertens "Law of Federal In·come Taxation" § 36.04.

"Distributable net income" first appears on our stage in plaintiff's claim ·that, by excluding capital gains and tax.able stock dividends from the allocation

base used in determining the amount of administration expenses deductible, the Commissioner of Internal Revenue followed Special Instruction 39 of the instructions to Form 1041, the fiduciary income tax return. Instruction 39 applies to the separate schedule on the form to be used for the computation of "distributable net income," and says that for this purpose tax-exempt interest is to be reduced by

"any amounts which, but for the provisions of Section 265, would be deductible in respect of disbursements, expenses, losses, etc., of the trust or estate, directly or indirectly allocable to such interest. The amount of the indirect disbursements, etc., allocable to tax-exempt interest is that amount which bears the same ratio to the total disbursements, etc., of the trust or estate not directly attributable to other items of income as the total tax-exempt interest received bears to the total of all the items of gross income (including tax-exempt interest * * *) entering into *distributable net income*" (emphasis added).

By including only those items of gross income which enter into distributable net income, this instruction excludes capital gains and taxable stock dividends (both allocable to corpus). The plaintiff says that the Commissioner also presumably relied on the examples in section 1.652(c)–4 of the Treasury Regulations,

11. Under Section 651(b), distributable net income, as adjusted by excluding the tax-exempt income of the trust and the deductions allocable to tax-exempt income, establishes the maximum deduction to be :allowed to the trust on account of distributions to beneficiaries. In this manner, the trust's maximum deduction for ·distributions will be roughly equivalent to the gross taxable income entering into ·the computation of fiduciary income ·(e. g., tax-exempt income and capital ·gains, etc., allocable to corpus are ex·cluded), reduced by the deductible expenses of the trust (including deductible ·expenses allocable to corpus, but excluding expenses that are non-deductible be·cause allocable to tax-exempt income).

Secondly, distributable net income—without the above-mentioned adjustment— establishes the maximum amount of the distributions which the beneficiaries must include in their gross incomes. § 652(a). The Code also specifies that the amounts includible in the beneficiaries' gross incomes "shall have the same character in the hands of the beneficiary as in the hands of the trust," and for this purpose requires that the proportionate composition of distributable net income is to be used to determine the amounts of the various classes of income (e. g., a distribution composed partly of tax-exempt interest, and partly of rents, etc.) includible by the beneficiaries. § 652(b).

which similarly determine the amount of administration expenses allocable to tax-exempt interest. The argument is that the instruction and the regulation are unreasonable in arbitrarily ignoring large classes of income, and that this exclusion will result, through the years, in the over-collection of tax. Plaintiff urges that, although the "artificial concept" of distributable net income may be suited to the determination of the maximum amount of income taxable to beneficiaries, "it is peculiarly ill-adapted to answer the far more simple and truly unrelated question of what general administration expenses are allocable to tax-exempt interest."

The defendant's reply is that Instruction 39 to Form 1041, and the examples set forth in various regulations under subchapter J, are irrelevant to the question of allocation of deductions by the trust; they relate to the computation of distributable net income, and "although in such computation capital gains and losses are also excluded, this has only an indirect bearing upon the reasonableness of the allocation under Section 265(1) which is here involved." Thus abandoning the stance taken by the Commissioner, the Government proposes a new theory which in this case (it says) would reach approximately the same result as that of the Commissioner and would therefore deprive the plaintiff of

its claimed refund.[12] Plaintiff, in turn, attacks the defendant's substitute theory as wholly unwarranted.

On the narrowest view of the question presented to us by this case, we would not have to resolve these controversies. Strictly, only the *trust's* taxable income is before us. And where, as here, the allowable deductions are insufficient to absorb the distributable net income of the trust (excluding tax-exempt income and deductions allocable thereto) the result of the subchapter J system of taxation is that the taxable income of the trust is unchanged, whether or not income allocable to principal account is included in the base for the allocation of otherwise deductible expenses between taxable and tax-exempt income.[13] This is true because the deduction for income required to be distributed currently— which in this case equals (and can never exceed) the distributable net income reduced by tax-exempt income and the deductions allocable thereto—and the allowable operating expenses are both proper deductions, in themselves, from the trust's taxable income, but at the same time the expense deductions are also proper deductions in computing distributable net income itself. Since the expense deductions enter into the computation of taxable income, and distributable net income (which here equals the current distribution deduction) is a func-

12. Defendant contends that Section 265, which disallows deductions allocable to tax-exempt interest "whether or not any amount of such interest is received or accrued," shows on its face that the allocation of deductions is not to be made solely on the basis of annual income. It asserts that, considering the mandate of Treasury Regulation § 1.265–1(c), that "a reasonable proportion * * * [of expenses allocable to both exempt and non-exempt income] determined in the light of all the facts and circumstances in each case shall be allocated to each," it is "unfortunate" that the Commissioner of Internal Revenue assumed that the allocation was to be in accordance with income received in 1954, for the correct criterion for allocation of the legal expenses here involved would seem to be the proportionate values of the property

held for the production of taxable and tax-exempt income. As we have indicated, defendant points out that allocation under the latter method would, in this instance, reach approximately the same result as the Commissioner's. The primary reason suggested for the proposition that capital gains are to be excluded from the allocation base is that capital gain is a "random factor" bearing no direct relationship to the claimed deductions.

13. Had plaintiff's primary contention, that the legal fees incurred in the construction proceeding were deductible under Section 212, been sustainable, the allowable deductions would have absorbed the distributable net income. The problems would then have been different.

tion of taxable income, the two types of deduction are intimately related, varying inversely with each other. If plaintiff is right and capital gains allocable to principal are included in the allocation base, the deduction for legal fees (and trustee's commissions) will be increased, but that increase will necessarily push down the taxable income (before deduction for current distributions), and therefore the current distribution deduction, by the same amount. Since the adjusted distributable net income limits the deduction available to the trust for amounts of income required to be distributed currently, the changes in the amount of expenses deductible by the trust will be offset by countervailing changes in the amount of the deduction for distributions, and the taxable income of the trust will be static. So far as the trust is concerned, we could, therefore, under the present circumstances, abstain from deciding the exact make-up of the deductions.

However, it will not do to stop so short of giving a response to the issue argued to us. While in these circumstances the inclusion of capital gains (and other amounts not includible in the computation of distributable net income) in the allocation base does not alter the taxable income of the trust, it would decrease the tax liability of the income beneficiaries. This would be the direct result of the decrease in distributable net income stemming from that inclusion, for distributable net income limits the amount required to be included in gross income by the income beneficiaries. It seems appropriate, therefore, to take the step of answering on its merits the allocation issue posed by the parties.[14]

Returning then to the arguments on allocation, we find it necessary to consider the plaintiff's attack on the Commissioner's method of allocation because we cannot agree with the defendant's assertion that Instruction 39 and the regu-

lations under subchapter J are irrelevant to the reasonableness of the allocation of trust expenses under Section 265(1). Treasury Regulation 1.652(c)–4, to which taxpayer refers, furnishes an example of the application of the rules for trusts required to distribute all income currently. Subparagraph (e) of this example consists of a computation of the taxable income of a trust, and the allocation of indirect expenses to the taxable and nontaxable portions of the trust's income is made, without discussion, on a distribution base from which capital gains allocable to corpus have been excluded. This is a plain enough indication, which we cannot ignore, of the specific method the Commissioner has chosen, *by regulation,* for the allocation of the expenses of trusts. Instruction 39, which by its terms purports to operate within the boundaries of Section 265, simply follows suit. More generally, the over-all regulation on allocation of expenses between taxable and tax-exempt income (Section 1.265–1(c), quoted above) requires that allocation of indirect expenses should be made "in the light of all facts and circumstances in each case." When the income of a trust is involved, the concept of distributable net income, as well as the special system of taxation in subchapter J, is an important component "of all the facts and circumstances." That concept and system are, as we have said, the primary mechanisms by which the income of a trust is taxed but once, either to the trust or to its beneficiaries; as the Tax Court has held, they should not be disregarded in applying the general allocation provisions of Section 265 to the particular problems of trust income. See Tucker v. Commissioner, supra, 38 T.C. No. 96.

Since the challenged regulation and instruction are thus applicable, we are controlled by their provisions unless we can agree with plaintiff that they are unreasonable as applied to the case be-

14. The full Tax Court has rejected the plaintiff's position in a case involving similar circumstances. Tucker v. Com-

missioner, 38 T.C. No. 96, decided September 26, 1962.

fore us. Estate of Bahen v. United States, Ct.Cl., 305 F.2d 827, 829, 835, decided July 18, 1962. But in the present circumstances—where the deductible expenses fall short of absorbing the distributable net income [15]—the regulation and the instruction do not unfairly ignore large classes of income in making the expense allocation. The income beneficiaries are taxable only to the extent of distributable net income, which excludes gains attributable to corpus. It is not out of key, therefore, to insist that the allocation of expenses between taxable and tax-exempt income should be restricted to the same type of non-corpus gains. This is all the more so since, under Section 652(b), the amounts included in the income beneficiary's gross income have the same character in his hands—e. g., as taxable dividends or tax-exempt interest—as in the hands of the trust (see footnote 11, supra). Moreover, under the 1954 Code, as a result of the structure of distributable net income (which has as its starting point the taxable income of the trust), the tax benefit of deductions allocable to corpus is generally shifted to the income beneficiaries. See Tucker v. Commissioner, supra, 38 T.C. No. 96. The challenged regulation and instruction allowably balance this incongruity—that the income beneficiary, not the corpus beneficiary, receives the tax benefit of expenses allocable to corpus—by providing that those indirect expenses which are usually chargeable against capital gains must be allocated by the income beneficiary to all the income (both taxable and tax-exempt) required to be distributed to him. *All*

the income required to be distributed currently by the trust and "included" in gross income by the beneficiary (particularly tax-exempt income), rather than just the taxable elements, bears the burden of the expenses attributable to capital gain. The tax benefit of the portion of these expenses assigned to tax-exempt income is lost, but this is not unfair to a taxpayer who has the special advantage of deductions attributable to gains he does not receive. Perhaps there may be other trust situations in which the Commissioner's regulations on allocation are unreasonable, but they are not so in the circumstances we have here. Plaintiff cannot recover the tax computed under those regulations.

In partial answer, plaintiff relies strongly on a twenty-year old internal directive of the Revenue Service to its agents (Field Procedure Memorandum No. 232, dated October 30, 1942), which authorized capital gains to be taken into account in full for trust allocation purposes. We doubt the weight to be given at this time to such non-public internal instructions, but in any event it must be recognized that the memorandum was addressed to agents charged with the administration of a law prohibiting the tax benefit of deductions chargeable to corpus from being enjoyed by the income beneficiaries, and the system of allocation of expenses it suggested was tailored to that need.[16] The changed system of taxing fiduciaries set forth in subchapter J of the 1954 Code robs the memorandum of continued persuasiveness in this field.

■ Finally, we must consider, as our third issue, plaintiff's claim that it is en-

---

15. See footnote 13, supra.

16. Section 24(d) of the 1939 Code provided that amounts paid under local law as income to the holder of a life or terminable interest acquired by gift, bequest, or inheritance "shall not be reduced or diminished * * * by any deduction allowed by this chapter * * * for the purpose of computing the net income of an estate or trust but not allowed under * * * [local law] for the purpose of computing the income to which such holder is entitled."

Under this provision, if a trust was required to distribute all its income currently, and had no gains allocable to corpus against which an expense chargeable to corpus could be deducted, the tax benefit of the deduction was lost.

Subchapter J of the 1954 Code was expressly drafted to prevent the wastage of deductions chargeable to corpus for fiduciary accounting purposes, by generally shifting the tax benefit of such deductions to the income beneficiaries.

titled to a deduction under Section 651 for amounts of income for the taxable year which it is required to distribute to its beneficiaries. See footnote 11, supra. When plaintiff filed its return, the full deduction it took for attorneys' fees swallowed all distributable net income, and there was therefore no occasion to claim such a deduction. Now that we diminish the deduction for legal fees, distributable net income reappears and a deduction is warranted. The only barrier is the possibility that plaintiff may not have adequately preserved this item in its refund claim. That claim asserted that "in the taxable year, claimant was required by the trust agreement to distribute all its income currently to beneficiaries, and was entitled to deduct the amount of such income under Section 651 in computing its taxable income." This explicit reference to a deduction for distributable net income was sufficient to alert the Commissioner of Internal Revenue to the taxpayer's potential entitlement to the deduction claimed. It is reasonable to assume that, his attention being directed to the increased taxable income (before deduction for distributions) which his denial of other claimed deductions had brought about, the Commissioner would have, and should have, considered the effect upon the deduction provided by the Code for amounts of income required to be distributed currently, when plaintiff had expressly claimed that the deduction was available to it. See Harlan v. United States, Ct.Cl., 312 F.2d 402 at p. 408, decided January 11, 1962. The document plaintiff filed was not a bare assertion that the refund claim was filed "to protect all possible legal rights of the taxpayer," and which "gives no notice of the amount or nature of the claim for which the suit is brought, and refers to no facts upon which it may be founded." United States v. Felt & Tarrant Co., 283 U.S. 269, 272, 51 S.Ct. 376, 377, 75 L.Ed. 1025 (1931);

cf. Maryland Casualty Co. v. United States, 251 U.S. 342, 353–354, 40 S.Ct. 155, 64 L.Ed. 297 (1920). In the circumstances the claim was sufficiently specific.

For these reasons, the plaintiff is entitled to recover on the third issue,[17] with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c). As to the first and second issues, defendant's motion for summary judgment is granted, plaintiff's motion is denied, and the petition is dismissed.

JONES, Chief Judge, and DURFEE, LARAMORE and WHITAKER, Judges, concur.

17. The Internal Revenue Service will be able to reopen the tax returns of the income beneficiaries to take into account our holding that the trust was entitled to a deduction for income required to be distributed currently. See Section 1311, 1954 I.R.C., and following sections.